RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0220P (6th Cir.)
File Name: 03a0220p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GLADYS ROBERTS,
> *Plaintiff-Appellant/*
> *Cross-Appellee,*

v.

UNIVERSAL UNDERWRITERS
INS. CO.,
> *Defendant-Appellee/*
> *Cross-Appellant.*

Nos. 01-3653/3695

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 00-01180—Dan A. Polster, District Judge.

Argued: December 9, 2002

Decided and Filed: July 2, 2003

Before: BATCHELDER and MOORE, Circuit Judges;
COLLIER, District Judge.[*]

---

[*] The Honorable Curtis L. Collier, United States District Judge for the Eastern District of Tennessee, sitting by designation.

2    *Roberts v. Universal*      Nos. 01-3653/3695
     *Underwriters Ins. Co.*

---

## COUNSEL

**ARGUED:** Kenneth L. Gibson, WEICK, GIBSON & LOWRY, Cuyahoga Falls, Ohio, for Appellant. Daniel A. Richards, WESTON, HURD, FALLON, PAISLEY & HOWLEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Kenneth L. Gibson, WEICK, GIBSON & LOWRY, Cuyahoga Falls, Ohio, for Appellant. Daniel A. Richards, Robert E. Goff, Jr., Ronald A. Rispo, WESTON, HURD, FALLON, PAISLEY & HOWLEY, Cleveland, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court, in which COLLIER, D. J., joined. BATCHELDER, J. (pp. 16-17), delivered a separate concurring opinion.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. The plaintiff, Gladys Roberts ("Roberts"), appeals the district court's grant of summary judgment to the defendant Universal Underwriters ("Universal") in this diversity action. Roberts's son, Stephen, was an employee of MacIntire Chevrolet, which had both primary and umbrella insurance policies with Universal. Stephen was killed in an automobile accident caused by an underinsured and negligent driver. The insurance policy that Universal issued to MacIntire Chevrolet limited the amount of underinsured coverage to $25,000. Roberts argues that this limitation was ineffective because Universal did not properly offer underinsured motorist coverage in the amount of the policy limits, and that as a result, she is entitled to the full amount of liability insurance under the main and umbrella policies.

The district court granted summary judgment to Universal, holding that there was a valid offer of underinsured motorist coverage in the amount of the policy limits. The district court did, however, award Roberts $25,000, the amount of underinsured coverage listed on the selection form. Roberts appeals that decision, claiming that she is entitled to an award of the full amount of the policy limits, $5,000,000. Universal cross-appeals, claiming that the $25,000 sum that was awarded should have been entirely offset by the $100,000 that was potentially available from the negligent driver's insurance policy.

Because the district court erred in holding that there was a valid offer of underinsured motorist coverage, we **REVERSE** the district court's grant of summary judgment to Universal and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

On September 24, 1999, Stephen Roberts was seriously injured in an automobile accident caused by the negligence of Ryan Warner ("Warner"). Stephen died five days later. Although Warner was insured, the damages sustained by Stephen and his family exceeded the amount of coverage available under Warner's policy. Gladys Roberts, Stephen's mother, filed the instant action against Universal, seeking to recover pursuant to an insurance policy held by Stephen's employer, MacIntire Chevrolet.[1]

Universal issued the policy in question to MacIntire Chevrolet for the policy period of November 1, 1998 to November 1, 1999. The written policy provided a package of garage and basic automobile coverage (collectively referred to as "primary coverage") as well as an umbrella policy. The primary coverage had a liability limit of $300,000; the umbrella coverage had a liability limit of $5,000,000. The policy also provided uninsured/underinsured ("UM/UIM") motorist coverage. MacIntire Chevrolet's president, Arthur McIntyre, signed a written selection form specifying that certain designated high-level employees would receive $1,000,000 in coverage while garage employees would receive $25,000 in coverage. The written form briefly described the UM/UIM coverage it provided, but did not, however, include the price of premiums for UM/UIM coverage.

The policy acquired by MacIntire Chevrolet in 1998 was a renewal policy. MacIntire Chevrolet obtained the first version of this policy from Universal in 1992. At the time that the first policy was issued, Universal's agent, Frank Szocs ("Szocs"), discussed UM/UIM coverage with MacIntire's then general manager, Frank Montisano ("Montisano"). There is no evidence that these negotiations resulted in a written offer or a written rejection of UM/UIM coverage.

Roberts and Universal both moved for summary judgment. The district court denied Roberts's motion for summary judgment and granted Universal's motion. The district judge held that UM/UIM coverage was both properly offered and selected, and that Roberts was therefore only entitled to the $25,000 of UM/UIM coverage explicitly stated in the policy. Roberts has appealed to this court. Universal has cross-appealed, claiming that the district court erred in not setting off the award by the $100,000 available from Warner's insurance policy.

---

[1]These claims have come to be known generally as *Scott-Pontzer* claims, pursuant to the Ohio Supreme Court's decision in *Scott-Pontzer v. Liberty Mutual Fire Insurance Co.*, 710 N.E.2d 1116 (Ohio 1999), where the Ohio Supreme Court held that an employee (who was not acting within the scope of his employment) was an insured under his employer's commercial liability policies, and therefore entitled to UM/UIM benefits that arose as a matter of law. *See Lee-Lipstreu v. Chubb Group of Ins. Cos.*, 329 F.3d 898, 899 (6th Cir. 2003) (describing further the nature of these *Scott-Pontzer* claims).

## II. ANALYSIS

### A. Jurisdiction

The district court below had diversity jurisdiction over the plaintiff's claim pursuant to 28 U.S.C. § 1332, as the plaintiff is an Ohio citizen and the defendant is a citizen of Kansas. *See Lee-Lipstreu v. Chubb Group of Ins. Cos.*, 329 F.3d 898, 899-900 (6th Cir. 2003) (holding that federal courts have jurisdiction over actions by an insured against his or her own insurance company if the two are diverse because such actions are not direct actions within the meaning of 28 U.S.C. § 1332(c)(1)). This court has jurisdiction over the district court's final judgment pursuant to 28 U.S.C. § 1291.

### B. Standards of Review

We review a district court's grant of summary judgment de novo. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). The denial of summary judgment is usually considered an interlocutory order and thus not appealable. *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002), *cert. denied*, 123 S. Ct. 866 (2003). "However, when the appeal from a denial of summary judgment is presented together with an appeal from a grant of summary judgment, we have jurisdiction to review the appropriateness of the district court's denial." *Thomas v. United States*, 166 F.3d 825, 828 (6th Cir. 1999). We review a district court's denial of summary judgment based purely on legal grounds de novo. *Id*. Summary judgment is appropriate only when there is no genuine dispute as to a material question of fact and one party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

### C. Uninsured/Underinsured Motorist Coverage

Former Ohio Revised Code § 3937.18 required insurance companies, when they offered motor vehicle liability policies, to offer UM/UIM coverage in an amount equal to the liability

limits of the policy.[2] If an insurance company did not offer UM/UIM coverage in such an amount, an injured insured was given by law UM/UIM coverage in the full amount of the policy. *Gyori v. Johnston Coca-Cola Bottling Group, Inc.*, 669 N.E.2d 824, 827 (Ohio 1996). Ohio courts stressed that "[t]he purpose of the requirement is to protect persons injured in automobile accidents from losses which, because of the tort-feasor's lack of liability coverage, would otherwise go uncompensated," and that the "statute should be construed liberally in order to effectuate [this] legislative purpose." *Id.* at 826 (quotations omitted). As a result, "insurance companies [bore] the burden of showing that any rejection was knowingly made by the customer." *Id.* (quotation omitted).

To simplify the problems of proof in these types of cases, the Ohio Supreme Court in *Gyori* interpreted the statute (as it was written before it was amended in 1997 by H.B. 261) to require both a written offer of UM/UIM coverage and a written rejection of that offer, even though the statute on its face did not explicitly call for either. *Id.* at 827. In *Linko v. Indemnity Insurance Co. of North America*, 739 N.E.2d 338 (Ohio 2000), the court (again interpreting the pre-H.B. 261 statute) made these requirements even more stringent, mandating that insurance companies include in the written

---

[2]This statute was written in 1970 and has been amended repeatedly since. In 2001, the Ohio legislature amended the statute to eliminate the requirement that insurers offer UM/UIM coverage altogether. *See* OHIO REV. CODE ANN. § 3937.18(A) (2002) (stating that an insurer "may, but is not required to, include uninsured motorist coverage, underinsured motorist coverage, or both uninsured and underinsured motorist coverages").

Under Ohio law, however, "the statutory law in effect on the date of issue of each *new* policy is the law to be applied." *Wolfe v. Wolfe*, 725 N.E.2d 261, 266 (Ohio 2000). Since the accident occurred on September 24, 1999, the policy taking effect November 1, 1998 and expiring November 1, 1999 is the one relevant to this case. This policy is governed by the statute as it existed on November 1, 1998, which is after the enactment of H.B. 261 in 1997 (whose impact will be discussed later).

offer of UM/UIM coverage, "a brief description of the coverage, the premium for that coverage, and an express statement of the UM/UIM coverage limits." *Id.* at 342. The *Linko* court also made clear that extrinsic evidence was not admissible to show that there was a valid offer or a valid rejection of UM/UIM coverage. Instead, "the four corners of the insurance agreement control in determining whether the waiver was knowingly and expressly made . . . . [T]he issue of whether coverage was offered and rejected should be apparent from the contract itself." *Id*. at 343. These rules apply both to primary insurance policies as well as to umbrella policies. *Gyori*, 669 N.E.2d at 826 ("The mandates of R.C. 3937.18 apply to providers of excess coverage as well as providers of primary liability coverage.").

In partial response to *Gyori*, the Ohio legislature passed H.B. 261 in 1997. H.B. 261 made several changes to § 3937.18. Relevant here are the changes it made to section (C) of the statute, which was amended to read in part:

> A named insured's or applicant's written, signed rejection of both coverages as offered under division (A) of this section, or a named insured's or applicant's written, signed selection of such coverages in accordance with the schedule of limits approved by the superintendent, shall be effective on the day signed, shall create a presumption of an offer of coverages consistent with division (A) of this section, and shall be binding on all other named insureds, insureds, or applicants.

OHIO REV. CODE ANN. § 3937.18(C) (1998).

As of November 1998, § 3937.18 contained a special provision for renewal policies, excepting them from having to

offer UM/UIM coverage altogether.[3] The provision stated in part:

> Unless a named insured or applicant requests such coverages in writing, such coverages need not be provided in or made supplemental to a policy renewal or a new or replacement policy that provides continuing coverage to the named insured or applicant where a named insured or applicant has rejected such coverages in connection with a policy previously issued to the named insured or applicant by the same insurer or affiliate of that insurer.

OHIO REV. CODE ANN. § 3937.18(C) (1998). As long as the insured "has rejected such coverages in connection with a policy previously issued," a renewal policy did not have to meet the requirements described above. *Id.*

The district court based its grant of summary judgment to Universal on two independent rationales. First, the district court believed that the 1998 policy negotiations satisfied the requirements of § 3937.18 as it was amended by H.B. 261. Alternatively, the district court believed that the policy was a renewal policy within the meaning of § 3937.18(C), and that Universal was therefore exempt from having to offer UM/UIM coverage in the first place. Roberts challenges both of those determinations, and we address each in turn.

---

[3] Section 3937.18 was amended in 2001 so that it no longer requires insurance companies to offer UM/UIM coverage at all. With that change made, there was no longer any need specifically to except renewal policies from having to offer UM/UIM coverage, and so the renewal provision was deleted. Nevertheless, as was discussed earlier, this case is governed by the law as it was at the time of the 1998 policy, when the renewal provision was still part of the statute.

## D. The 1998 Offer and Acceptance

Roberts's first contention is that the district court erred in holding that the offer and rejection of UM/UIM coverage in the 1998 policy negotiations satisfied Universal's obligations to offer UM/UIM coverage under § 3937.18. After careful analysis, we agree with Roberts. Universal's 1998 offer did not state the price of the premium for UM/UIM coverage. Under Ohio law, it is clear that this makes the offer of UM/UIM coverage fatally defective, resulting in UM/UIM coverage arising by operation of law in the amount of the policy's limits.

Universal does not dispute that its 1998 offer did not meet the *Gyori* and *Linko* requirements, and that its offer of UM/UIM coverage would not have been sufficient under the statute as it existed before H.B. 261. Universal argues, however, that H.B. 261 has done away with the strict requirements of *Linko* and *Gyori*. According to Universal, because it has put forward evidence of a written and signed selection of coverage, H.B. 261 creates a presumption that Universal has complied with its obligations under § 3937.18.

The district court found Universal's logic persuasive. Believing that H.B. 261 essentially overruled the *Gyori* and *Linko* decisions, the district court held that the written, signed selection of coverage offered by Universal satisfied its obligations under Ohio law. Roberts could only defeat Universal's motion for summary judgment, according to the district court, by showing that the rejection was either not signed, not written, or fraudulently induced. As there was no such showing, the district court granted summary judgment to the defendant on these grounds. Roberts argues, however, that the *Linko* requirements still apply after H.B. 261.

We need not settle this debate of state law ourselves, however, because the Ohio Supreme Court resolved this question several weeks after oral argument in this case. *See Kemper v. Michigan Millers Mut. Ins. Co.*, 781 N.E.2d 196

(Ohio 2002). In *Kemper*, the Ohio Supreme Court answered the following certified questions, the first in the affirmative and the second in the negative:

> "(1) Are the requirements of *Linko v. Indemnity Ins. Co.* [2000], 90 Ohio St. 3d [445, 739 N.E.2d 338], relative to an offer of UM/UIM coverage, applicable to a policy of insurance written after enactment of [1997] HB 261 and before [2001] SB 97?
>
> "(2) If the *Linko* requirements are applicable, does, under [1997] HB 261, a signed rejection act as an effective declination of UM/UIM coverage, where there is no other evidence, oral or documentary, of an offer of coverage?"

*Id.* at 197 (brackets in original). These answers make it unmistakably clear that the *Linko* requirements still apply to policies after H.B. 261 went into effect. It is equally clear that the rejection/selection form offered by Universal does not comport with the *Linko* requirements. Although the form contains a written description of the coverage and an express statement of the UM/UIM limits, it does not include the price of the premiums for UM/UIM coverage, which was explicitly required by *Linko*. *Linko*, 739 N.E.2d at 342 ("We agree with the following required elements for written offers imposed by Ohio appellate courts: a brief description of the coverage, the premium for that coverage, and an express statement of the UM/UIM coverage limits."); *see also Kemper*, 781 N.E.2d at 197 (Moyer, C.J., dissenting) ("By its holding today, the majority requires insurers to 'inform the insured of the availability of UM/UIM coverage, set forth the premium for UM/UIM coverage, include a brief description of the coverage, and expressly state the UM/UIM coverage limits in its offer' even after the adoption of H.B. 261.") (citation omitted).

Under the Ohio Supreme Court's decision in *Kemper*, we are bound to conclude that Universal's offer of UM/UIM coverage is defective. Our holding is consistent with

numerous Ohio intermediate appellate court decisions that have held offers invalid under *Kemper* solely for not containing premium information. *See Flournoy v. Valley Forge Ins. Co.*, No. 02AP-1008, 2003 WL 1995629, at *5 (Ohio Ct. App.–10th Dist. May 1, 2003) ("[T]he parties do not dispute that the uninsured and underinsured motorist coverage offer form completed by the city of Delaware did not state any premium for the uninsured and underinsured motorist coverage. Accordingly, we conclude that the rejection is invalid."); *Taylor v. Universal Underwriters Ins. Co.*, No. 01AP-922, 2003 WL 1495561, at *2-*3 (Ohio Ct. App.–10th Dist. Mar. 25, 2003); *Jordan v. Travelers Prop. Cas. Ins. Co.*, No. 2002CA00248, 2003 WL 1257084, at *5 (Ohio Ct. App.–5th Dist. Mar. 17, 2003); *Glover v. Smith*, Nos. C-020192, C-020205, 2003 WL 832493, at *4 (Ohio Ct. App.–1st Dist. Mar. 7, 2003).[4] The UM/UIM selection form

---

[4] We note that two Ohio lower courts have held offers of UM/UIM coverage valid under *Kemper* even when the offers admittedly did not contain the necessary premium information apparently required by *Linko*. *See Bogan v. Johnson*, 787 N.E.2d 737, 740-41 (Ohio Com. Pl. 2003); *Manalo v. Lumberman's Mut. Cas. Co.*, No. 19391, 2003 WL 264344, at *4-*5 (Ohio Ct. App.–2d Dist. Feb. 7, 2003). These courts have relied on the Ohio Supreme Court's negative answer to the second certified question, which was whether a signed rejection was sufficient "where there is no other evidence" of a valid offer. *Kemper*, 781 N.E.2d at 196. These courts have reasoned that if extrinsic evidence were irrelevant, there would be no reason to note that the case at issue involved "no other evidence." The Ohio Supreme Court's holding that a signed rejection alone was insufficient to reject UM/UIM coverage without other evidence suggested to these two courts that extrinsic evidence could now be used to convert an insufficient offer into a sufficient one.

We are unable to draw the inference from the one-word answer in *Kemper* that these two courts have drawn. Nothing in the Ohio Supreme Court's answer suggests that extrinsic evidence can be used to support a signed rejection. The only basis in *Kemper* for inferring that extrinsic evidence could be used comes from the *question* certified to the Ohio Supreme Court by a federal district court in the Northern District of Ohio. By asking whether a signed rejection alone (without extrinsic evidence, such as oral evidence) constitutes a valid rejection, the question did, to an extent, intimate that extrinsic evidence could be used in the determination of whether a rejection was valid. But the question was not drafted by the

is therefore defective for not containing premium information, and there is no other written offer in the record mentioned by the parties that lists premium information. As a result, we must conclude that the 1998 insurance contract between MacIntire Chevrolet and Universal was defective because Universal never validly offered UM/UIM coverage and it was never validly rejected by MacIntire Chevrolet. *See Gyori*, 669 N.E.2d at 827 & n.3 (noting that there must be a valid offer before there can be an express, knowing rejection); *see also Linko*, 739 N.E.2d at 342. The district court's decision to grant the defendant summary judgment on this ground was therefore error.

## E.  The Renewal Exception

Universal, however, would still be entitled to summary judgment if this policy were a valid renewal policy within the meaning of § 3937.18(C), for renewal policies do not need to offer UM/UIM coverage at all. Roberts argues, however, that the 1998 policy is not exempted from having to offer UM/UIM coverage because the original 1992 policy itself never validly rejected UM/UIM coverage. We agree with Roberts that the original rejection of UM/UIM coverage was invalid, and that Universal cannot rely on that invalid rejection to justify the later 1998 defective offer and acceptance.

Section 3937.18(C), in 1998 when the policy in this case was issued, stated that UM/UIM offers "need not be provided in . . . a policy renewal or a new or replacement policy . . . where a named insured or applicant has rejected such

---

Ohio Supreme Court; it was drafted by a federal district court. The Ohio Supreme Court therefore has in no way undercut its rulings that the premium for insurance must be stated in the written offer, *see Linko*, 739 N.E.2d at 342, and that this requirement still applies after the passage of H.B. 261, *see Kemper*, 781 N.E.2d at 196. Bound by those statements, we must hold the offer here, which did not state the premium, to be fatally defective.

coverages in connection with a policy previously issued." Ohio Rev. Code Ann. § 3937.18(C) (1998). The 1998 policy is a renewal policy that dates back to the original 1992 policy. In 1992, the then-general manager of MacIntire Chevrolet, Frank Montisano, discussed the policy with Universal's then-agent Frank Szocs. According to their depositions, Szocs gave Montisano an oral quotation and never offered UM/UIM coverage in the amount equal to the liability limits. Universal does not dispute the lack of a written offer, although it does point out that Szocs and Montisano did extensively discuss UM/UIM coverage and came to an agreement.

Universal's 1992 offer is plainly insufficient under *Gyori* and *Linko*. *See Gyori*, 669 N.E.2d at 827 (holding that "in order for a rejection of UM coverage to be expressly and knowingly made, such rejection must be in writing," and that "there can be no rejection pursuant to R.C. 3937.18(C) absent a written offer of UM coverage"). The 1992 negotiations did not result either in a written offer of UM/UIM coverage or a written rejection of it.

Because MacIntire Chevrolet's initial rejection of UM/UIM coverage was invalid, the renewal provision of § 3937.18(C) does not apply here. This conclusion accords with the decisions of Ohio intermediate courts which have held that where an initial policy involves an invalid offer or rejection of UM/UIM coverage, a later policy cannot be treated as a renewal policy exempt from having to offer UM/UIM coverage, because to do so would circumvent the requirement that there be, at some time, a valid offer and rejection of UM/UIM coverage. *See Purvis v. Cincinnati Ins. Co.*, No. 2001-CA-104, 2002 WL 538926, at *6 (Ohio Ct. App.–2d Dist. Apr. 12, 2002) (holding that a 1995 signed rejection of UM/UIM coverage "was invalid and [therefore] did not obviate the need" for the insurance company properly to offer and have rejected UIM coverage in 1998, even though the 1998 policy was simply a renewal of the 1995 policy), *rev'd on other grounds*, 785 N.E.2d 474, 475 (Ohio 2003);

*Lamphear v. Cont'l Cas. Co.*, No. 78325, 2001 WL 563300, at *3 (Ohio Ct. App.–8th Dist. May 24, 2001) (holding that a 1996 offer, although it was a renewal offer, was invalid to limit UM/UIM coverage because the earlier offers dating back to 1990, like the 1996 offer, were defective for not giving the price of premiums in writing).[5] As a result, since there was never a valid offer and rejection of UM/UIM coverage in 1992, the renewal provision of § 3937.18(C) is inapposite here.

---

[5] There are, admittedly, some cases that have held policies to be renewal policies exempt from having to reoffer UM/UIM coverage under § 3937.18(C) even though they all involved initially ineffective rejections. *See Hammer v. Lumbermens Mut. Cas. Co.*, No. L-98-1283, 1999 WL 628684, at *8-*10 (Ohio Ct. App.–6th Dist. Aug. 20, 1999); *Hillyer v. State Farm Mut. Auto Ins. Co.*, 722 N.E.2d 108, 113-14 (Ohio Ct. App.–3d Dist. 1999); *Hillyer v. State Farm Ins. Co.*, No. 97-L-031, 1998 WL 1093918, at *4 (Ohio Ct. App.–11th Dist. Dec. 18, 1998). These cases, however, all had a critical feature that is not present here. In each of these cases, the initial rejections were ineffective because they were received after the beginning of the policy term. These ineffective rejections, however, became effective rejections when the next policy term began.

For example, with a policy dated January 1, 1990 to December 31, 1990, a rejection returned on February 1, 1990 would be ineffective. However, that ineffective rejection would be effective for the next period of January 1, 1991 to December 31, 1991, because it was returned before the beginning of *that* period. A district court in our circuit has noticed this: "Even if that rejection form was not effective for the 1991 policy year, because it was not received until after the effective date of the policy, it was effective for the subsequent policy year (1992). Once ConRail [the insured] effectively rejected UM/UIM coverage, Reliance [the insurer] was not required to provide it in any subsequent renewal policy unless ConRail requested it in writing." *Lafferty v. Reliance Ins. Co.*, 109 F. Supp. 2d 837, 843 (S.D. Ohio 2000).

This case, in contrast, does not involve an ineffective rejection that became effective for a later policy period. Universal's failure to put the offer into writing is not a defect in the offer that is somehow corrected simply by the passage of time.

## III. CONCLUSION

As both the initial 1992 offer and rejection and the 1998 offer and rejection were both invalid to limit UM/UIM coverage under Ohio law, we conclude that Universal's offer of UM/UIM coverage to MacIntire Chevrolet was inadequate and that UM/UIM coverage therefore arises in the amounts of the policy limits under the primary and umbrella policies. We therefore **REVERSE** the district court's grant of summary judgment to the defendant, and we **REMAND** this case to the district court for further proceedings consistent with this opinion.[6]

---

[6]We note that we do not consider here several arguments that Universal claims entitle it to summary judgment. We leave unresolved Universal's contention that Roberts was not an insured under the policy because he was not acting in the scope of his employment. Although this issue was properly raised below, it was never addressed by the district court. *But cf. Lawler v. Fireman's Fund Ins. Co.*, 322 F.3d 900, 907-08 (6th Cir. 2003) (finding a scope-of-employment limitation ineffective, and stating generally that Ohio law "preclude[s] an employer from relying on scope-of-employment limitations in the definition of an insured when UM/UIM coverage is found to arise by operation of law"). We also leave to the district court on remand the issue of whether Universal is entitled to an offsetting credit based on the amount available to the plaintiff under the tortfeasor's insurance, because it also was not addressed by the district court.

---

## CONCURRENCE

---

ALICE M. BATCHELDER, Circuit Judge, concurring.

"When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean—neither more nor less."

"The question is," said Alice, "whether you *can* make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master —— that's all."

Alice was too much puzzled to say anything; so after a minute Humpty Dumpty began again. "They've a temper, some of them—particularly verbs: they're the proudest—adjectives you can do anything with, but not verbs—however, *I* can manage the whole lot of them! Impenetrability! That's what *I* say!"

"Would you tell me, please," said Alice, "what that means?"

. . .

LEWIS CARROLL, THROUGH THE LOOKING GLASS 186 (Penguin Books 1998) (1872).

While the plain language of the insurance contract in this case clearly indicates that Mr. Roberts, while riding his own motorcycle outside the scope of employment, was not covered by his employer's insurance, and a careful reading of § 3937.18(C) (1998), indicates that MacIntyre Chevrolet's signed selection of UM/UIM coverage in 1998 created a presumption that Universal had offered UM/UIM coverage in accordance with the requirements of subsection (A), neither the words of a contract nor the words of a statute mean what they say through the looking glass of the Ohio Supreme Court. That court has redefined concepts such as "interpretation" and ridden roughshod over basic legal

principles such as privity of contract, and we, as a federal court sitting in diversity jurisdiction, are bound by its holdings on issues of state law.  My concurrence in the majority's lucid and well-constructed opinion in this judicially mangled area of law is therefore compelled.